**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**



FILED
CLERK, U.S. DISTRICT COURT

JUL 2, 2019

CENTRAL DISTRICT OF CALIFORNIA
BY:    BH    DEPUTY

Kim Kardashian West,

Plaintiff,

v.

Misguided Limited et al.,

Defendant.

2:19-cv-01258 VAP JEM

**Order DENYING Plaintiffs'
Request for Entry of Default and
GRANTING IN PART Plaintiffs'
Motion for Default Judgment
(Doc. Nos. 17, 19.)**

Before the Court is Plaintiff Kim Kardashian West and her loan out company Kimsaprincess, Inc.'s ("Kardashian") request for entry of default against Defendant Misguided Limited ("Misguided UK") and motion for default judgment against Defendants Misguided UK and Misguided USA Finance Inc. ("Misguided USA").  (Doc. Nos. 17, 19).  After considering all papers filed in support of Kardashian's motions, the Court **DENIES** Kardashian's request for entry of default against Misguided UK and **GRANTS IN PART** Kardashian's motion for default judgment against Misguided USA.

## I. BACKGROUND

Kardashian is a television celebrity, model and spokesperson who enjoys a large social media following.  Compl. ¶ 12.  Because of her popularity and reach on social media, companies routinely pay Kardashian millions of dollars in fees to serve as a celebrity endorser.  *Id.* ¶ 13.

United States District Court
Central District of California

1  Kardashian owns several federally registered trademarks in her name,
2  including without limitation: KIM KARDASHIAN WEST, U.S. Registration No.
3  4,989,420 (International Class 41); KIM KARDASHIAN WEST, U.S.
4  Registration No. 4,978,865 (International Class 35); and KIM
5  KARDASHIAN, U.S. Registration No. 4,516,079 (International Class 35).  *Id.*
6  ¶ 42.  Kardashian has used these marks extensively in connection with
7  many products and services, including Kardashian's advertising and
8  promotion of third-party products in the fashion and beauty industries.  *Id.* ¶
9  41.

10

11       Defendants Misguided UK and Misguided USA (collectively,
12  "Misguided") is an online clothing retailer that specializes in inexpensive
13  clothing.  *Id.* ¶ 16.  It that has become well-known for copying designs worn
14  by celebrities, including Kardashian.  *Id.*  According to Kardashian,
15  Misguided USA's website, www.misguidedus.com, includes entire pages
16  devoted to the sale of clothing inspired by Kardashian on which Misguided
17  uses Kardashian's name and likeness without her permission to promote its
18  products.  *Id.* ¶¶ 17, 18.  In addition, Misguided has repeatedly used
19  Kardashian's name and likeness without permission on its social media
20  platforms to promote the sale of its clothing.  *Id.* ¶¶ 20, 21.  Kardashian
21  alleges that the consuming public is likely and has come to the mistaken
22  conclusion that Kardashian is affiliated with Misguided.  *Id.* ¶ 23.
23  Kardashian alleges Misguided has infringed her registered and common law
24  trademarks and has violated her right of publicity by using her name and
25  likeness on its websites and social media platforms.  *Id.* ¶¶ 26, 44.

26

United States District Court
Central District of California

On February 20, 2019, Kardashian filed a complaint against Misguided, alleging: (1) violations of her statutory right of publicity under Cal. Civ. Code § 3344; (2) violations of her common law right of publicity; (3) false designation of origin in violation of § 43 of the Lanham Act, 15 U.S.C. § 1125(a); (4) trademark infringement in violation of § 32 of the Lanham Act, 15 U.S.C. § 1114(1); and (5) common law trademark infringement.  (Doc. No. 1).  Misguided has yet to respond to Kardashian's complaint.

## II.    REQUEST FOR ENTRY OF DEFAULT

Before the Court decides whether to grant default judgment, Federal Rule of Civil Procedure 55(b)(2) requires the Clerk's entry of default.  Entry of default is appropriate "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend."  Fed. R. Civ. P. 55(a).  However, a party has no duty to defend unless the plaintiff properly served the defendant with the summons and complaint, or waives such service, pursuant to Federal Rule of Civil Procedure 4.

On April 10, 2019, Kardashian filed a request for entry of default against Misguided UK.  (Dkt. 17.)  Therein, Kardashian provided that Misguided UK was served on March 11, 2019 pursuant to Article 5 of the Hague Convention in compliance for Rule 4(f).  (Dkt. 17, Declaration of Gregory P. Korn ("Korn Decl.") ¶ 4.)  On April 11, 2019, the clerk issued a "Notice of Deficiency" stating that Plaintiffs' request for entry of Misguided UK's default had been forwarded to the assigned judge for consideration, because the clerk "does not have the authority to enter default against a foreign entity."  (Dkt. 18.)  Therefore, the Court must determine whether Misguided UK was

United States District Court
Central District of California

properly served in accordance with Rule 4(f), which governs the permissible methods of service on a corporation in a foreign country.

Rule 4(h) states that a foreign corporation must be served, if outside the United States, in accordance with Rule 4(f).  Fed. R. Civ. P. 4(h).  Rule 4(f)(1) authorizes service by methods specifically authorized by international agreements, including the Hague Convention.  It is mandatory to apply the Hague Convention when both countries are signatories to the Convention. *See Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 699 (1988).  The United Kingdom and the United States are both signatories, so the rules of the Hague Convention apply.  *See Buzztime Entm't, Inc. v. Sony Computer Entm't Europe Ltd*, 2008 WL 11337017, at *2 (S.D. Cal. July 10, 2008).

Here, Kardashian engaged the services of "Across the Pond Services," an English company that specializes in serving process in the United Kingdom pursuant to the Hague Convention.  (Korn Decl. ¶ 2.)  According to Kardashian's proof of service, process server John Frederick Talbot ("Talbot"), acting as an agent for solicitor Graham Henry Bridgman ("Bridgman"), served Misguided UK's paralegal at its registered office in Manchester, England on March 11, 2019.  (Dkt. No. 14.)  Kardashian's counsel contends that this method of service was done in accordance with sub-paragraph (b) of the first paragraph of Article 5 of the Hague Convention.  (Korn Decl. ¶ 4.)  Article 5, sub-paragraph (b) provides that "[t]he Central Authority of the State addressed shall itself serve the document or shall arrange to have it served by an appropriate agency … by

United States District Court
Central District of California

a particular method requested by the applicant, unless such a method is incompatible with the law of the State addressed."  *See* https://assets.hcch .net/docs/f4520725-8cbd-4c71-b402-5aae1994d14c.pdf, (Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters), last visited on May 31, 2019.

Talbot was acting as an agent for Bridgman, a solicitor for the Senior Courts of England and Wales, who was in turn acting at the direction of the Central Authority of England and Wales.  (Dkt. No. 14.)  Therefore, Talbot was acting on behalf of the Central Authority of England, which complies with Article 5.  However, the issue is whether the method requested by Kardashian to serve Misguided UK is compatible with United Kingdom law. United Kingdom Civil Procedural Rule 6.4.4 provides that "a document is served personally on a company or other corporation by leaving it with a person holding a senior position within the company or corporation."  U.K. C.P.R. 6.4.4.  "Senior position" is defined as a director, treasurer, secretary, chief executive, manager or other officer of the company."  U.K. C.P.R. & Service Practice Direction 6.2(1).  In this case, Talbot served Misguided UK's paralegal, which is not a "senior position" under United Kingdom law; thus, the method used in this case was "incompatible with the law of the State addressed."

For this reason, the Court finds Kardashian has not met her burden of showing proper international service in accordance with the Hague Convention as required under Rule 4(f).  Because the Court finds Misguided UK was not properly served, the Court **DENIES** Kardashian's request for

United States District Court
Central District of California

1  entry of default.[1]  The Court will give Kardashian an opportunity to renew a

2  motion for default judgment following proof of proper service of a summons

3  and complaint upon Misguided UK.

4

5                    **III.    MOTION FOR DEFAULT JUDGMENT**

6    **A.   Legal Standard**

7        Federal Rule of Civil Procedure 55 authorizes the Court to enter a

8  default judgment against a party who "fail[s] to plead or otherwise defend" a

9  claim.  Fed. R. Civ. P. 55 (a)–(b)(2).  "Even if entry of default has been made

10  by the court clerk, granting a default judgment is not automatic; rather it is

11  left to the sound discretion of the court."  *PepsiCo v. Triunfo-Mex, Inc.*, 189

12  F.R.D. 431, 432 (C.D. Cal. 1999) (citing *Aldabe v. Aldabe*, 616 F.2d 1089,

13  1092 (9th Cir. 1980)).  Upon default, the factual allegations of the complaint,

14  except those relating to the amount of damages, will be taken as true.

15  *Televideo Sys. Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987); *see*

16  *also DirecTV, Inc. v. Hoa Huynh*, 503 F.3d 847, 854 (9th Cir. 2007); Fed. R.

17  Civ. P. 8(b)(6).

18

19        In exercising its discretion to grant or deny an application for default

20  judgment, the Court considers the following factors: (1) the possibility of

21

22  [1] Because Kardashian has not properly effectuated service on Misguided
UK, the Court cannot enter a default judgment against the foreign entity.
23  *See Keith J. Walker v. Elick Toby Bowler, et al.*, 2018 WL 6118427, at *2
(C.D. Cal. Feb. 2, 2018) ("Even assuming plaintiff had properly effectuated
24  service on the defendants in issue, entry of a default judgment under Fed.
R. Civ. P. 55(b) would be premature absent the Clerk's entry of default as to
25  such defendant under Fed. R. Civ. P. 55(a).")  Notwithstanding, the Court
may enter default judgment against Misguided USA because the Clerk en-
26  tered default against them on March 29, 2019.  (Doc. No. 12.)

prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits (collectively, "*Eitel* factors").  *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).  The merits of the plaintiff's substantive claim and the sufficiency of the complaint are often treated by courts as the most important *Eitel* factors.  *Mnatsakanyan v. Goldsmith & Hull APC*, No. 2:12-cv-04358-MMM-PLAx, 2013 WL 10155707, at *10 (C.D. Cal. May 14, 2013).

In addition, Local Rule 55-1 provides that an application for default judgment must be accompanied by a declaration in compliance with Federal Rule of Civil Procedure 55(b) setting forth, inter alia, when and against what party the default was entered and the identification of the pleading to which default was entered.

### B.   Discussion

As a threshold matter, Kardashian has satisfied the requirements of Local Rules 55-1 and 55-2 and Federal Rule of Civil Procedure 55(b). Kardashian has requested (Dkt. 11) and received (Dkt. 12) an entry of default against Misguided USA.  Moreover, Misguided USA is neither an infant nor incompetent nor in military service or otherwise exempt under the Soldiers' and Sailors' Civil Relief Act of 1940. See Motion at 13; Doc. No. 19-1, Declaration of Gregory Korn ("Korn Decl.") ¶ 2).  Having determined Kardashian's procedural compliance, the Court will address each *Eitel* factor

7

to determine whether Kardashian is entitled to a default judgment against Misguided USA.

### 1. Possibility of Prejudice to Plaintiff

The first *Eitel* factor considers "whether the plaintiff will suffer prejudice if default judgment is not entered."  *PepsiCo, Inc. v. California Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002).  Absent default judgment in this case, Kardashian would be denied the right to judicial resolution of the claims presented, and would be without other recourse for recovery. *See id.*; *Elektra Entm't Group Inc. v. Crawford*, 226 F.R.D. 388, 392 (C.D. Cal. 2005). Accordingly, this factor weighs in favor of default judgment.

### 2. The Merits of Plaintiff's Substantive Claims and Sufficiency of the Complaint

Courts often consider the second and third *Eitel* factors together.  *See PepsiCo*, 238 F. Supp. 2d at 1175. The second and third *Eitel* factors look at whether Plaintiff's complaint has sufficiently stated a claim for relief. In their analysis of the second and third *Eitel* factors, courts accept as true all well-pleaded allegations regarding liability.  *See Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002).

### a.   Trademark Infringement

Kardashian seeks default judgment against Misguided USA on her claims for trademark infringement in violation of § 32 of the Lanham Act, 15 U.S.C. § 1114(1), and for false designation of origin in violation of § 43 of the Lanham Act, 15 U.S.C. § 1125(a).  Section 32 of the Lanham Act "provides the registered owner of a trademark with an action against anyone who

United States District Court
Central District of California

without consent uses a 'reproduction, counterfeit, copy, or colorable imitation' of the mark in such a way that 'is likely to cause confusion or to cause mistake, or to deceive.'"  *Enesco Corp. v. Price/Costco Inc.*, 146 F.3d 1083, 1085 (9th Cir. 1998) (quoting 15 U.S.C. § 1114(1)).  Similarly, section 43(a) of the Lanham Act creates a civil cause of action against "[a]ny person who ... uses in commerce any word, term, name, symbol, or device ... or ... false or misleading representation of fact, which ... is likely to cause confusion ... as to the affiliation ... or approval of his or her goods, services, or commercial activities by another person ...."  15 U.S.C. § 1125(a).

To establish a trademark infringement claim under either section of the Lanham Act, a party "must prove: (1) that it has a protectible [sic] ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion." *Dep't of Parks & Recreation v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006).

### 1.    Ownership of a Valid Trademark

Registration of a mark is "prima facie evidence of the validity of the registered mark[,]... of the registrant's ownership of the mark, and ... [of the] exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration." 15 U.S.C. § 1115(a); *see also Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999) (party's "registration of the mark on the Principal Register in the Patent and Trademark Office constitutes prima facie evidence of the validity of the registered mark and of exclusive right to use the mark on the goods and services specified in the registration").

9

United States District Court
Central District of California

1

2    Kardashian alleges that she owns several valid federally registered

3    trademarks in her name.  Compl. ¶¶ 42, 43.  These marks include (1) U.S.

4    Registration No. 4,989,420, International Class 41 for KIM KARDASHIAN

5    WEST; (2) U.S. Registration No. 4,978,865, International Class 35, for KIM

6    KARDASHIAN WEST; and (3) U.S. Registration No. 4,516,079, International

7    Class 35, for KIM KARDASHIAN.  *Id.*  Because Misguided USA has failed to

8    rebut the presumption of ownership by virtue of default, the Court finds

9    Kardashian has sufficiently alleged ownership of a valid trademark.

10

11                    2.      Likelihood of Confusion

12    The test for likelihood of confusion is whether a 'reasonably prudent

13    consumer' in the marketplace is likely to be confused as to the origin of the

14    good or service bearing one of the marks."  *Dreamwerks Production Group,*

15    *Inc. v. SKG Studio, d/b/a Dreamworks SKG*, 142 F.3d 1127, 1129 (9th Cir.

16    1998).  In celebrity-based infringement actions, the Ninth Circuit examines

17    eight factors to determine the likelihood of confusion:

18

19              (1) the level of recognition that the [celebrity] has among the

20              segment of the society for whom the [opposing party's] product

21              is intended; (2) the relatedness of the fame or success of the

22              [celebrity] to the [opposing party's] product; (3) the similarity of

23              the likeness used by the [opposing party] to the actual

24              [celebrity]; (4) evidence of actual confusion; (5) marketing

25              channels used; (6) likely degree of purchaser care; (7) [the

26

1    opposing party's] intent [in] selecting the [celebrity]; and (8)

2    likelihood of expansion of the product lines.

3

4    *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1007 (9th Cir. 2001).

5

6        Accepting Kardashian's allegations as true, the Court finds that the

7    *Downing* factors weigh in favor of finding a likelihood of confusion.  First,

8    Kardashian is a world-famous celebrity who "enjoys one of the largest social

9    media followings of any celebrity in the world, including more than 120

10   million followers on Instagram, and close to 60 million followers on Twitter."

11   Compl. ¶ 12; Declaration of Kim Kardashian West ("Kardashian Decl.) ¶ 6).

12   As such, the first *Downing* factor weighs in Kardashian's favor because "[a]

13   mark with extensive public recognition and renown deserves and receives

14   more legal protection than an obscure or weak mark."  *YKK Corp. v.*

15   *Jungwoo Zipper Co.*, 213 F.Supp.2d 1195, 1200 (C.D. Cal. 2002).

16

17       Second, Kardashian's allegations support a finding that the

18   "relatedness" of Kardashian's fame is closely related to Misguided USA's

19   fashion brand.  Kardashian is a highly sought-after spokesperson for

20   products in the fashion and cosmetics industries.  Doc. No. 19-1,

21   Declaration of Todd Wilson ("Wilson Decl.") ¶ 2).  Relatedly, Misguided USA

22   is a "fast-fashion" clothing company that is "particularly well-known for

23   copying designs worn by famous celebrities, which it then offers for sale on

24   its sites within days—sometimes even hours—of the celebrity appearing in

25   the clothing."  Compl. ¶ 16.  Indeed, Misguided USA's website includes

26   pages devoted entirely to the sale of clothing inspired by Kardashian.

United States District Court
Central District of California

United States District Court
Central District of California

1  Compl. ¶ 17.  Therefore, the Court finds that this creates a danger that "the

2  public will mistakenly assume there is an association between the producers

3  of the related foods, though no such association exists."  *AMF Inc. v.*

4  *Sleekcraft Boats*, 599 F.2d 341, 350 (9th Cir. 1979).

5

6      With respect to the third and fourth *Downing* factors, Kardashian has

7  submitted extensive evidence showing Misguided USA's use of her fame to

8  promote the sale of its clothing.  This evidence includes copies of webpages

9  from www.misguidedus.com featuring photographs of Kardashian and nine

10  screenshots of Misguided USA using Kardashian's photograph on its

11  Instagram account to promote its brand.  Korn Decl. ¶¶ 8-10, Ex. 4-15.

12  Next, with respect to actual confusion, Kardashian alleges that Misguided

13  USA's systematic use of her fame has caused the public to "come to the

14  mistaken conclusion that she is affiliated with Misguided and is working

15  hand in hand with the company to create "fast fashion" versions of her

16  clothing."  Compl. ¶ 23.  In support, Kardashian submits an article entitled

17  *Kim K and Misguided: Fast Fashion at its Quickest or a Marketing Ploy in*

18  *Disguise?* which accuses Kardashian of coordinating with Misguided USA.

19  Korn Decl. ¶ 11, Ex. 16.  Additionally, Kardashian herself declares that she

20  has seen articles online accusing her of secretly collaborating with

21  Misguided USA.  Kardashian Decl. ¶ 12.  Based on these allegations and

22  supporting evidence, the Court finds the third and fourth *Downing* factors

23  weigh in Kardashian's favor.

24

25      As to the fifth *Downing* factor, "convergent marketing channels increase

26  the likelihood of confusion."  *Sleekcraft*, 599 F.2d at 353.  Here, both parties

1  sell their products online and promote their brand through the use of social

2  media, specifically Instagram.  Because of Kardashian's social media

3  following, "companies routinely pay Kardashian millions of dollars in fees to

4  serve as a celebrity endorser."  Compl. ¶ 13.  Depending on the nature of

5  the post, Kardashian receives fees from $300,000 to $500,000 for a single

6  social media post.  Wilson Decl. ¶ 5.  Similarly, Misguided USA promotes its

7  brand and products through social media posts and online articles.  Compl.

8  ¶ 45.  The Court finds these allegations sufficient to support a finding that

9  the parties use similar marketing channels to sell their products.  Thus, this

10 factor weights in Kardashian's favor.

11

12     Finally, with respect to the seventh *Downing* factor, "[t]he relevant

13 question is whether the defendants intended to profit by confusing

14 customers" by implying endorsement."  *White v. Samsung Elec.*, 971 F.2d

15 1395, 1400 (9th Cir. 1992).  Here, Kardashian alleges Misguided USA has

16 "repeatedly used Kardashian's name and image without authorization to

17 generate interest in their brand and website, and to elicit sales of their

18 products."  Compl. ¶ 15.  Kardashian further alleges that Misguided USA

19 "purposefully inserted Kardashian's Instagram username @kimkardashian

20 into its post[s] to capitalize on her celebrity status and social media following

21 in promoting the sale of its upcoming product."  *Id.* ¶ 20.  Accepting

22 Kardashian's allegations as true, the Court finds this factor weighs in favor

23 of finding a likelihood of confusion.

24

25     Although Kardashian has not alleged facts to support the sixth (i.e.,

26 likely degree of purchaser care) or eighth (i.e., likelihood of expansion of

United States District Court
Central District of California

product lines) *Downing* factors, "the  factors should not be weighed or
applied mechanistically, but used as a guide in assessing likelihood of
confusion."  *Aurora World, Inc. v. Ty Inc.*, 719 F. Supp. 2d 1115, 1165 (C.D.
Cal. 2009) (citing *Dreamwerks*, 142 F.3d at 1129.)  Because the majority of
*Downing* factors favor likelihood of confusion, the Court finds Kardashian's
allegations sufficient to support a finding of likelihood of confusion.
Therefore, the Court finds that Kardashian has sufficiently alleged false
designation of origin and trademark infringement.

       b.   Right of Publicity

     Kardashian seeks default judgment on her common law and statutory
right of publicity claims.  Mot. at 14.  In California, "the right of publicity is
both a statutory and a common law right."  *Comedy III Productions, Inc. v.
Gary Saderup, Inc.*, 25 Cal. 4th 387, 391 (2001).  To sustain a common law
cause of action for right of publicity, a plaintiff must prove: "(1) the
defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's
name or likeness to defendant's advantage, commercially or otherwise; (3)
lack of consent; and (4) resulting injury."  *Downing*, 265 F.3d at 1001
(quoting *Eastwood v. Superior Court*, 149 Cal. App. 3d 409, 417 (1983)).
Under California's statutory right of publicity, codified as Cal. Civ. Code §
3344, "any person who knowingly uses another's name, voice, signature,
photograph, or likeness, in any manner ... for purposes of advertising ...
without such person's prior consent ... shall be liable for any damages
sustained by the person." Cal. Civ. Code § 3344(a).  To prevail on a
statutory right of publicity claim under section 3344, a plaintiff must prove all
the elements of the common law cause of action and "allege a knowing use

United States District Court
Central District of California

1   by the defendant as well as a direct connection between the alleged use

2   and the commercial purpose."  *Downing*, 265 F.3d at 1001 (quoting

3   Eastwood, 149 Cal. App. 3d at 417).

4

5       Kardashian alleges that Misguided USA "has willfully and without

6   authorization used Kardashian's name, image, likeness, and persona for

7   commercial purposes, to advertise the Misguided brand and website, and to

8   promote the sale of clothing on Misguided's site."  Compl. ¶ 34.  Kardashian

9   alleges that, as a direct and proximate result of Misguided USA's conduct,

10  Kardashian has suffered damages in the amount of no less than $10 million.

11  Compl. ¶¶ 28, 36.  According to Kardashian, Misguided USA's unauthorized

12  use of her name and image have been particularly harmful because it

13  damages her credibility and dilutes her brand by making it appear as though

14  she is indiscriminately endorsing Misguided's products.  Kardashian Decl.

15  ¶¶ 11-12; Wilson Decl. ¶¶ 10-12.  Taken as true, the Court finds these

16  allegations sufficiently allege that Misguided USA knowingly used

17  Kardashian's image for a commercial advantage without her consent and

18  that Kardashian has suffered an injury as a result.  Further, Kardashian's

19  allegations that Misguided USA used Kardashian's name and image on its

20  website to advertise its brand and promote the sale of clothing, taken as

21  true, shows a direct connection between Misguided USA's use and a

22  commercial purpose.  Therefore, the Court finds that Kardashian has

23  adequately pled common law and statutory right of publicity claims.

24

25      Accordingly, the second and third *Eitel* factors favor entry of default

26  judgment against Misguided USA.

1

2          3. <u>The Sum of Money at Stake</u>

3          The fourth *Eitel* factor requires the Court to balance the amount of

4    money at stake against the seriousness of Defendant's conduct.  "Default

5    judgment is disfavored where the sum of money at stake is too large or

6    unreasonable in relation to defendant's conduct."  *Vogel v. Rite Aid Corp.*,

7    992 F. Supp. 2d 998, 1012 (C.D. Cal. 2014).  In her motion, Kardashian

8    seeks $5,000,000 in damages based on her right of publicity claims,

9    $103,600 in attorneys' fees and a permanent injunction.  Mot. at 17-18, 20-

10   22.

11

12         On a right of publicity claim, Kardashian is entitled to seek lost profits in

13   the form of the fair market value of her name; however, the amount must be

14   limited to the manner in which her name was used by Misguided USA.  *See*

15   *Clark v. Am. Online Inc.*, 2000 WL 33535712, at *8 (C.D. Cal. Nov. 30,

16   2000).  The Court acknowledges that Kardashian has adduced evidence

17   that she receives millions of dollars from licensing deals to allow third-party

18   companies to use her name and image.  Kardashian Decl. ¶ 13; Wilson

19   Decl. ¶¶ 3-7.  However, as discussed *infra*, the Court finds that $5 million is

20   not an accurate measure tailored to the specific misconduct of Misguided

21   USA.  Therefore, this factor advises against entering default judgment as to

22   damages.

23

24         4. <u>Possibility of a Dispute Concerning Material Facts</u>

25         The fifth *Eitel* factor requires the Court to consider the possibility of

26   dispute as to material facts in the case.  Where a plaintiff's complaint is well-

16

United States District Court
Central District of California

pleaded and the defendants make no effort to properly respond, the likelihood of disputed facts is very low.  *See Landstar Ranger, Inc. v. Parth Enters., Inc.*, 725 F. Supp. 2d 916, 921 (C.D. Cal. 2010). "Because all allegations in a well-pleaded complaint are taken as true after the court clerk enters default judgment, there is no likelihood that any genuine issue of material fact exists."  *Elektra Entm't,* 226 F.R.D. at 393.  Accordingly, the fifth *Eitel* factor weighs in favor of default judgment.

5. <u>Possibility of Excusable Neglect</u>

The sixth *Eitel* factor considers the possibility that a defendant's default resulted from excusable neglect.  *Vogel*, 992 F. Supp. 2d at 1013; *see also Eitel*, 782 F.2d at 1471–72.  Due process requires that interested parties be given notice of the pendency of the action and be afforded an opportunity to present its objections before a final judgment is rendered.  *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  While there is always a possibility that a defendant might appear and claim excusable neglect, where the defendants "were properly served with the Complaint, the notice of entry of default, as well as the papers in support of the instant motion," this factor favors entry of default judgment.  *Shanghai Automation Instrument Co. Ltd. v. Kuei*, 194 F. Supp. 2d 995, 1005 (N.D. Cal. 2001).  Here, despite proper service, Misguided USA made no effort to defend this suit.  Moreover, Kardashian's counsel provides that Misguided's counsel informed him "that neither of the Misguided entities intended to respond to [Kardashian's] Complaint."  Korn Decl. ¶ 4.  Taken as true, this obviates a finding of a possibility of excusable neglect.  Therefore, the sixth *Eitel* factor favors default.

6. <u>The Strong Public Policy Favoring Decisions on the Merits</u>

The seventh *Eitel* factor requires the Court to consider the strong judicial policy favoring decisions on the merits before granting default judgment. Whenever reasonably possible, cases should be decided upon their merits. *Eitel*, 782 F.2d at 1472; *PepsiCo*, 238 F. Supp. 2d at 1177.  However, the policy favoring decisions on the merits does not prevent a court from entering judgment where a defendant refuses to respond.  *PepsiCo*, 238 F. Supp. 2d at 1177.  Here, the Court is unable to make a decision on the merits because Misguided USA has intentionally chosen not to respond or take any action to defend itself in this case.  Accordingly, the seventh *Eitel* factor does not preclude the Court from entering default judgment against Misguided USA.

7.   <u>Summary of the *Eitel* Factors</u>

Based on the analysis above, the Court finds that *Eitel* factors support entry of default judgment against Misguided USA.  Kardashian has no other recourse and there is little possibility of excusable neglect in light of Misguided USA's intentional decision not to participate in this litigation. Further, Kardashian claims have merit, were sufficiently alleged in the Complaint, and there appears to be no dispute about material facts.  Given the factual circumstances here, these factors outweigh the large amount of money at stake and the policy favoring decisions on the merits.  Accordingly, the Court enters default judgment against Misguided USA.

**C.  Requested Relief**

Once liability is established, the plaintiff seeking default judgment must then establish that the requested relief is appropriate.  *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977).  A plaintiff's demand for relief must be specific and a plaintiff "must 'prove up' the amount of damages."  *Elektra Entm't Group v. Bryant*, 2004 WL 783123, at *5 (C.D. Cal. Feb. 13, 2004); Fed. R. Civ. P. 8(a)(3).  Pursuant to Rule 55(b)(2), district courts enjoy a "wide latitude" of discretion in determining damages.  *Elektra Entm't*, 226 F.R.D. at 394.  Here, Kardashian seeks $5 million in damages; $103,600 in attorneys' fees and a permanent injunction.  The Court will address each of Kardashian's requested remedies in turn.

1. <u>Damages</u>

Kardashian seeks $5 million in lost profits caused by Misguided USA's misconduct pursuant to Cal. Civ. Code 3344 (a).  *See* Cal. Civ. Code § 3344(a) (providing that a plaintiff may recover "the greater of seven hundred fifty dollars ($750) or the actual damages suffered by him or her as a result of the unauthorized use, and any profits from the unauthorized use that are attributable to the use and are not taken into account in computing the actual damages.")  "[T]he standard for measuring lost profits in a right of publicity case is the fair market value of the right to use plaintiff's name or likeness in the manner in which it was used by defendant."  *Clark*, 2000 WL 33535712, at *8; *see also Hoffman v. Capital Cities/ABC, Inc.*, 33 F.Supp.2d 867, 875 (C.D. Cal. Jan. 22, 1999) *rev'd on other grounds*, 255 F.3d 1180 (9th Cir. 2001) (celebrity entitled to compensatory damages in an amount

United States District Court
Central District of California

representing the fair market value of the right to utilize his name and

likeness in the manner in which it was used by defendant magazine).

Here, Kardashian estimates that the fair market value of Misguided

USA's use of her name and likeness is no less than $5 million based on her

previous licensing deals.  Mot. at 17.  Kardashian explains that her

multimillion dollar licensing deals are for "more involved arrangements

where [she] will partner with a company for a longer period of time," that she

"often works closely with [her] licensing partners to develop specific

products for her endorsement," and that she "typically insist[s] on reviewing

and approving all products that are promoted using [her] name and image

before the products are released to the public."  Kardashian Decl. ¶¶ 7, 13.

To substantiate her $5 million estimated fair market value, Kardashian

compares Misguided USA's use of her name and image to a recent

licensing deal with a company that manufacturers wearable consumer

goods.  Wilson Decl. ¶ 7.  There, the licensee agreed to pay Kardashian

over $6 million annually plus a significant equity interest in exchange for two

promotional appearances and the right to use Kardashian's name and

image in marketing and selling goods.  *Id.* ¶¶ 7-8.

The Court finds that such licensing deals are distinguishable from the

manner in which Misguided USA used Kardashian's name and image in this

case.  Here, with the exception of two, the Instagram posts at issue do not

directly seek to promote the sale of Misguided USA's clothing.  *Compare*

Compl. ¶ 20 and Dkt. 19-1, Ex. 8 *with* Dkt. 19-1, Ex. 9-15.  Rather, Exhibits

9-15 show Misguided USA using Kardashian's name and image to create

United States District Court
Central District of California

comedic internet memes and to report on recent news involving Kardashian and her famous family.  Consequently, these images are likely not violations of Kardashian's right of publicity because such uses are protected by the First Amendment.  *See Winter v. DC Comics*, 30 Cal. 4th 881, 888, 69 P.3d 473, 477 (2003).  Nevertheless, because Misguided USA failed to appear and defend, the Court declines to consider the First Amendment defense to mitigate damages and includes these Instagram posts in calculating damages for deterrence purposes.

Furthermore, with respect to Exhibit 8 and the Instagram post pictured in the Complaint, the Court finds that Misguided USA's use therein is analogous to Kardashian's one-off endorsement deals, where she is paid $300,000 to $500,000 for a single social media post, rather than her multimillion dollar licensing deals.  Wilson Decl. ¶ 5.  Thus, the Court concludes that the proper measure of damages should be in the range of $300,000 to $500,000 per unauthorized Instagram post.  In light of Misguided USA's goodwill in taking the most recent Instagram post down "without any admission whatsoever of liability," Dkt. 19-1, Ex. 1, the Court finds the appropriate measure of damages to be the minimum amount of $300,000 per post.  Here, Kardashian submitted evidence of nine unauthorized Instagram posts containing her name and image on Misguided USA's account.  Compl. ¶ 20; Dkt. 19-1, Ex. 8-15.  Accordingly, the Court finds damages in the amount of $2,700,000 ($300,000 x 9 posts) to be reasonable.

United States District Court
Central District of California

2. <u>Injunctive Relief</u>

Kardashian seeks an injunction enjoining Misguided USA from using Kardashian's trademarks in connection with any product or service sold, marketed, or distributed by Misguided USA.[2]  Compl. ¶ 63; Mot. at 20-21. The Lanham Act expressly permits district courts to issue injunctions to prevent trademark infringement under 15 U.S.C. § 1116(a).  Permanent injunctive relief is appropriate where a plaintiff demonstrates: (1) it has suffered irreparable harm; (2) there is no adequate remedy at law; (3) the balance of hardships favors an equitable remedy; and (4) an issuance of an injunction is in the public's interest.  *eBay, Inc. v. MercExchange*, LLC, 547 U.S. 388, 391–92 (2006).

The Court finds that Kardashian's requested injunctive relief is appropriate.  First, there is a likelihood of irreparable harm in the form of damages to Kardashian's trademarks, business reputation and goodwill. *See Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir.2013) (holding that loss of control over business reputation and damage to goodwill are cognizable irreparable harms in the trademark infringement context).  Second, the Court doubts legal remedies are adequate to compensate for this harm.  *See Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988) ("Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is

---

[2] Kardashian's Motion only seeks injunctive relief pursuant to the Lanham Act and not pursuant to her California right of publicity claims. Mot. at 20-21.  As such, Kardashian has failed to meet her burden that she is entitled to injunctive relief pursuant to her right of publicity claims, and thus, the Court cannot permanently enjoin Misguided USA from using Kardashian's "name, image, likeness, and persona" as requested in her Complaint.

no adequate remedy at law for the injury caused by a defendant's continuing infringement.").  Third, the Court finds that the equities favor injunctive relief. Finally, injunctive relief would not disserve the public interest, as it would protect the public from likely confusion.  Accordingly, the Court **GRANTS** Kardashian's permanent injunction and enjoins Misguided USA from using Kardashian's trademarks in connection with the sale, marketing or distribution of its products.

### 3. Attorneys' Fees

Pursuant to Local Rule 55-3, Kardashian requests attorneys' fees in the amount of $103,600.  Mot. at 22.  In default judgment actions, Local Rule 55-3 provides "a default calculation of fees[.]"  *Vogel v. Harbor Plaza Ctr., LLC*, 893 F.3d 1152, 1159 (9th Cir. 2018).  However, "[i]f a party seeks a fee 'in excess of' the schedule and timely files a written request to have the fee fixed by the court, then the court ... is obliged to calculate a 'reasonable' fee in the usual manner, without using the fee schedule as a starting point."  *Id.*

Here, in seeking attorney's fees, Kardashian does not seek to deviate from the schedule.  Therefore, the Court will apply Local Rule 55-3 to calculate attorneys' fees.  *See Vogel*, 893 F.3d at 1160 ("[Local Rule 55-3] gives lawyers who obtain default judgments and who are entitled to statutory fees the option of recovering a set amount without going through the hassle of submitting records.").  According to the schedule, where a judgment is over $100,000, reasonable attorney's fees will be $5,600 plus 2% of the amount over $100,000.  *See* Local Rule 55-3.  Based on the abovementioned judgment of $2,700,000, Kardashian is entitled to

United States District Court
Central District of California

1    attorneys' fees in the amount of $59,600 ($5,600 + 0.02($2,700,000)).  The

2    Court finds this amount to be reasonable.

3

4                       **IV.    CONCLUSION**

5       The Court **DENIES** Kardashian's request for entry of default against

6    Misguided UK.  The Court **GRANTS IN PART** Kardashian's Motion for

7    Default Judgment against Misguided USA and permanently enjoins

8    Misguided USA from using Kardashian's trademarks in connection with the

9    sale, marketing or distribution of its products.  The Court awards Kardashian

10   $2,700,000 in damages and $59,600 in attorneys' fees.

11

12   **IT IS SO ORDERED.**

13

14    Dated:     7/2/19

15                                      Virginia A. Phillips

16                      Chief United States District Judge

17

18

19

20

21

22

23

24

25

26

United States District Court
Central District of California